Dye, J.
Frank Honigman died May 4, 1956, survived by his wife, Florence. By a purported last will and testament, executed April 3, 1956, just one month before his death, he gave $5,000 to each of three named grandnieces, and cut off his wife with a life use of her minimum statutory share plus $2,500, with direction to pay the principal upon her death to his surviving brothers and sisters and to the descendants of any predeceased brother or sister, per stirpes. The remaining one half of his estate was bequeathed in equal shares to his surviving brothers and sisters and to the descendants of any predeceased brother or sister, per stirpes, some of whom resided in Germany.
*248 When the will was offered for probate in Surrogate’s Court, Queens County, the widow Florence filed objections. A trial was had on framed issues, only one of which survived for determination by the jury, namely: “At the time of the execution of the paper offered for probate was the said Frank Honigman of sound and disposing mind and memory? ” The jury answered in the negative, and the Surrogate then made a decree denying probate to the will.
Upon an appeal to the Appellate Division, Second Department, the Surrogate’s decree was reversed upon the law and the facts, and probate was directed. Inconsistent findings of fact were reversed and new findings substituted.
We read this record as containing more than enough competent proof to warrant submitting to the jury the issue of decedent’s testamentary capacity. By the same token the proof amply supports the jury findings, implicit in the verdict, that the testator, at the time he made his will, was suffering from an unwarranted and insane delusion that his wife was unfaithful to him, which condition affected the disposition made in the will. The record is replete with testimony, supplied by a large number of disinterested persons, that for quite some time before his death the testator had publicly and repeatedly told friends and strangers alike that he believed his wife was unfaithful, often using obscene and abusive language. Such manifestations of suspicion were quite unaccountable, coming as they did after nearly 40 years of a childless yet, to all outward appearances, a congenial and harmonious marriage, which had begun in 1916. During the intervening time they had worked together in the successful management, operation and ownership of various restaurants, bars and grills and, by their joint efforts of thrift and industry, had accumulated the substantial fortune now at stake.
The decedent and his wife retired from business in 1945 because of decedent’s failing health. In the few years that followed he underwent a number of operations, including a prostatectomy in 1951, and an operation for cancer of the large bowel in 1954, when decedent was approximately 70 years of age.
From about this time, he began volubly to express his belief that Mrs. Honigman was unfaithful to him. This suspicion *249 became an obsession with him, although all of the witnesses agreed that the deceased was normal and rational in other respects. Seemingly aware of his mental state, he once mentioned that he was “ sick in the head ” (“ Mich krank gelassen in den Kopf”), and that “I know there is something wrong with me ” in response to a light reference to his mental condition. In December, 1955 he went to Europe, a trip Mrs. Honigman learned of in a letter sent from Idlewild Airport after he had departed, and while there he visited a doctor. Upon his return he went to a psychiatrist who Mr. Honigman said ‘ could not help ” him. Finally, he went to a chiropractor with whom he was extremely satisfied.
On March 21, 1956, shortly after his return from Europe, Mr. Honigman instructed his attorney to prepare the will in question. He never again joined Mrs. Honigman in the marital home.
To offset and contradict this showing of irrational obsession the proponents adduced proof which, it is said, furnished a reasonable basis for decedent’s belief, and which, when taken with other factors, made his testamentary disposition understandable. Briefly, this proof related to four incidents. One concerned an anniversary card sent by Mr. Krauss, a mutual acquaintance and friend of many years, bearing a printed message of congratulation in sweetly sentimental phraseology. Because it was addressed to the wife alone and not received on the anniversary date, Mr. Honigman viewed it as confirmatory of his suspicion. Then there was the reference to a letter which it is claimed contained prejudicial matter—but just what it was is not before us, because the letter was not produced in evidence and its contents were not established. There was also proof to show that whenever the house telephone rang Mrs. Honigman would answer it. From this Mr. Honigman drew added support for his suspicion that she was having an affair with Mr. Krauss. Mr. Honigman became so upset about it that for the last two years of their marriage he positively forbade her to answer the telephone. Another allegedly significant happening was an occasion when Mrs. Honigman asked the decedent as he was leaving the house what time she might expect him to return. This aroused his suspicion. He secreted himself *250 at a vantage point in a nearby park and watched his home. He saw Mr. Krauss enter and, later, when he confronted his wife with knowledge of this incident, she allegedly asked him for a divorce. This incident was taken entirely from a statement made by Mr. Honigman to one of the witnesses. Mrs. Honigman flatly denied all of it. Their verdict shows that the jury evidently believed the objectant. Under the circumstances, we cannot say that this was wrong. The jury had the right to disregard the proponents’ proof, or to go so far as to hold that such trivia afforded even additional grounds for decedent’s irrational and unwarranted belief. The issue we must bear in mind is not whether Mrs. Honigman was unfaithful, but whether Mr. Honigman had any reasonable basis for believing that she was.
In a very early case we defined the applicable test as follows: " If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act and speak like a sensible man.” (American Seamen’s Friend Soo. v. Hopper, 33 N. Y. 619, 624-625.)
It is true that the burden of proving testamentary incapacity is a difficult one to carry (Dobie v. Armstrong, 160 N. Y. 584), but when an objectant has gone forward, as Mrs. Honigman surely has, with evidence reflecting the operation of the testator’s mind, it is the proponents’ duty to provide a basis for the alleged delusion. We cannot conclude that as a matter of law they have performed this duty successfully. When, in the light of all the circumstances surrounding a long and happy marriage such as this, the husband publicly and repeatedly expresses suspicions of his wife’s unfaithfulness; of misbehaving herself in a most unseemly fashion, by hiding male callers in the cellar of her own home, in various closets, and under the bed; of hauling men from the street up to her second-story bedroom by use of bed sheets; of making contacts over the household telephone; and of passing a clandestine note through the fence on her brother’s property—and when he claims to have heard noises *251 which he believed to be men running about his home, but which he had not investigated, and which he could not verify—the courts should have no hesitation in placing the issue of sanity in the jury’s hands. To hold to the contrary would be to take from the jury its traditional function of passing on the facts.
Clapp v. Fullerton (34 N. Y. 190) is not controlling in the circumstances of this case. There, the decedent had not expressed his suspicion of the infidelity of his first wife, who had died 45 years earlier, until after the malting of the will, and even then he did so casually and discreetly. His belief was based on a statement made by the wife during her last illness, while she was in a state of delirium. Here, on the other hand, Mr. Honigman persisted over a long* period of time in telling his suspicions to anyone who would listen to him, friends and strangers alike. That such belief was an obsession with him was clearly established by a preponderance of concededly competent evidence and, prima facie, there was presented a question of fact as to whether it affected the will he made shortly before his death.
The proponents argue that, even if decedent was indeed laboring under a delusion, the existence of other reasons for the disposition he chose is enough to support the validity of the instrument as a will. The other reasons are, first, the size of Mrs. Honigman’s independent fortune, and, second, the financial need of his residuary legatees. These reasons, as well as his belief in his wife’s infidelity, decedent expressed to his own attorney. We dispelled a similar contention in American Seamen’s Friend Soc. v. Hopper (supra, p. 625) where wo held that a will was bad when its '‘ dispository provisions were or might have been caused or affected by the delusion ” (emphasis supplied).
The dictum of Matter of Nicholas (216 App. Div. 399, affd. without opinion 244 N. Y. 531), never approved by this court, is erroneous insofar as it points to the contrary.
We turn now to alleged errors committed by the Surrogate when he overruled objections based on section 347 of the Civil Practice Act. Much of Mrs. Honigman’s testimony, which should have been excluded as incompetent since it was evidence " concerning a personal transaction or communication between the witness [an interested party] and the deceased person”, *252 was admitted because the Surrogate believed that the proponents, by failing to object to such testimony at the earliest opportunity, irrevocably waived their right to protest on that ground. In de Laurent v. Townsend (243 N. Y. 130) this court was unanimous in holding that the rule as to waiver of objections under section 347 was to be found in that statute “ and not elsewhere” (p. 133). The statute provides an exception ' ' where the executor, administrator, survivor, committee or person deriving title or interest is examined in his own behalf, or the testimony of the lunatic or deceased person is given in evidence, concerning the same transaction or communication”. Since the exception is inapplicable to the circumstances here present, it was error not to exclude Mrs. Honigman’s testimony whenever objections based on the prohibition of section 347 were appropriately raised.
Finally, since there is to be a new trial of the issues, the Surrogate’s ruling with regard to the clergyman-penitent privilege deserves mention. Father Heitz, a Catholic priest, was called by the objectant, who sought to elicit from him a conversation he had had with the deceased at a time Avhen the latter wanted advice concerning his marital problems. Although Father Heitz Avas Avilling, he Avas not permitted to testify to the conversation, Specifically on the ground that any conversation Avith a priest, although not in the confessional, is privileged ”. There is nothing in the record to indicate the nature of the testimony sought. In this posture it cannot be determined whether such testimony falls Avithin the privilege created by section 351 of the Civil Practice Act.
The order appealed from should be reversed and a new trial granted, Avith costs to abide the event.