In the Matter of the Estate of MAUNTOURA ETOLL, Deceased. MARIE S. JOSEPH, Appellant; RONALD JOSEPH, Respondent.

Third Department, June 28, 1968.

*James L. Burke* for appellant.
*Lawrence J. Bizzarro* for respondent.

GIBSON, P. J. Appeal is taken from so much of a decree of the Surrogate's Court of Rensselaer County as (1) granted proponent's motion pursuant to CPLR 4404 (subd. [a]) to set aside a verdict which found that at the time of the execution of a propounded codicil to decedent's last will and testament, decedent

was not of sound mind and memory and (2) admitted said codicil to probate.

Decedent's will, dated September 26, 1962, and admitted to probate without objection, after making a number of $1,000 and $500 bequests to decedent's grandchildren, the children of her daughter and only child, and a number of $50 bequests to religious and other organizations, gave all of decedent's residuary estate to the daughter. The codicil, executed on January 3, 1966, and now in issue, gave decedent's home and its contents to decedent's sister and bequeathed various sums ranging from $200 to $800 to nephews and nieces. Neither decedent's daughter nor her grandchildren were mentioned in the codicil, which in terms did, however, republish the 1962 will as modified by the codicil. The daughter contested the probate of the codicil and is the appellant here. By proof adduced in large part from proponent's witnesses and meeting with little contradiction, if any, it was clearly established not merely that decedent was insane, with infrequent and very brief periods of lucidity, but that she suffered constant insane delusions that her daughter was endeavoring to cause her death by poisoning. The verdict was in accord with the evidence and should not have been disturbed.

Decedent, then 74 years old, was a patient at Leonard Hospital in Troy from December 2, 1965 until December 20, 1965. Returning to her home she was cared for there by a registered nurse on December 28 and 29. She was in Albany Medical Center Hospital from December 30, 1965 to December 31, 1965, when she was discharged against medical advice. On January 2, 1966, her daughter, the contestant, who had been with her, returned to her own home in Watkins Glen. On January 3, a lawyer came to her home and prepared the codicil and superintended its execution. On January 12 she was readmitted to Leonard Hospital, found "completely disoriented and confused" and discharged because she could not be controlled. Early in February, she entered Willard State Hospital, where she died on April 6, 1966.

Decedent's physician, Dr. DeLucia, who attended her in the hospital and at home, testified to a heart condition, with myocardial damage, and, also, to cerebral arteriosclerosis associated with a psychosis manifesting itself by episodes of confusion and disorientation. "These signs" he said, "stayed with her up to a point where she would have episodes of lucidness. I mean by that, that she would know what she was talking about. This would vary sometimes between 20 minutes, sometimes ½ hour and then she would go back because of the, of spasms of the arteries not carrying a sufficient amount of

blood to the brain causing her to again become disoriented." The Albany Medical Center Hospital recorded a diagnosis of: " 1. Arteriosclerotic heart disease. 2. Chronic Brain syndrome and senile brain disease " and a final diagnosis, upon discharge, of " Congestive heart failure; organic brain disease due to cerebral arteriosclerosis." Each hospital frequently recorded decedent's confusion and disorientation; and Albany Medical Center Hospital noted on December 31, 1965 that the patient was " refusing medications, believes people are trying to poison her and is confused." The nurse who cared for decedent at home on December 28 and 29 testified that on each day decedent was " mentally confused and disoriented ", and she " was unable to converse with me. She might seem to ramble on but you could speak to her but she didn't answer but she might look at you and look away without any real recognition of what you were saying to her [and did] not seem to recognize what was going on around her." Dr. Davidson, a resident in psychiatry, at Albany Medical Center Hospital, formed an " impression " of " chronic brain syndrome, an organic deterioration of the brain which was due to cerebral arteriosclerosis ". He recommended " that the patient be moved to the psychiatric unit of the hospital so that she could be properly taken care of in that branch as she was unmanageable as a patient in the medical ward she was in "; but, as has been noted, she was discharged, contrary to medical advice. Dr. Osinski, a specialist in and associate professor of psychiatry, testified, in response to a proper hypothetical question, and in great detail, and stated his opinion that decedent was incompetent to make a will on January 3, 1966.

Of great importance, indeed, was the testimony of proponent's witness, the decedent's pastor, Father Korkemaz, which strongly confirmed and greatly enlarged upon the evidence from other sources that decedent was under the delusion, not merely that she was in danger of being poisoned, but that it was appellant, her daughter, who wished to poison her and that, in fact, she would not accept medicine or water from her daughter but would take medicine from her sister and the latter's daughter, who became the principal legatees under the codicil. Father Korkemaz testified with respect to his conversations with decedent: " She was all right at the beginning and then other time she come up with a story, ' Is it true, Father, that the new [Vatican] Council ordered that the children, when the parents are sick and old, the children are ordered to kill their parents? ' I said, ' Mrs. Etoll, the Pope would not order killing. Who told you that? ' I said, ' No, Mrs. Etoll.' "

Although Father Korkemaz was proponent's principal witness, and his testimony must be deemed the only really substantial evidence supportive of the proponent's case, he invariably qualified his opinion of decedent's rationality and condition, on one occasion saying, '' She was rational all the time. Only after length of time she keep talking to herself and then she may go off and if you talked to her for quite some time she would be rational and occasionally drop off ''; and on another, on being asked as to how she appeared, he said, '' Perfect condition. But 15–20 minutes, but if you go along after that, she may go off.''

As against the rather massive proof of mental incapacity submitted to the jury for determination by it as the trier of the facts, the Surrogate subsequently found the proponent's proof conclusive. Apparently this result was based, first, upon the theory that decedent enjoyed an interval of lucidity at the time of the execution of the will and, second, upon an appraisal of the credibility of the opposing witnesses quite different from the evaluation thereof implicit in the verdict of the jury, to which the issues of credibility had initially been entrusted. In this connection we recognize, as did the Surrogate, that Dr. Osinski's opinion respecting decedent's competency on January 3 might well be discounted by a jury by reason of his conclusions that on certain other dates decedent was competent to execute a power of attorney to her daughter and an instrument authorizing access to a safe-deposit box; but we consider, first, that the issue of credibility was properly submitted to the jury, where it should have remained, and, second, that Dr. Osinski's testimony was not essential to the verdict. We do not agree, however, that all of the testimony of the contestant is suspect because of the incidents of the power of attorney and the safe-deposit box authorization, inasmuch as someone had to handle decedent's affairs during an illness of this nature and it does not impress us as heinous that her only child and sole distributee, who was also her sole residuary legatee, should do so, whether mistakenly or not, under her attorney's direction.

As against contestant's proof then, the Surrogate gave greater weight to the testimony of the subscribing witnesses and that of Father Korkemaz. However, and as follows from our discussions thereof hereinbefore set forth, the jury was not required to accept Father Korkemaz' testimony, considered in its entirety, nor his expressions of opinion, considered in context, as establishing testatrix' competency at the time of the execution of the codicil. The jury could properly attach

little weight to the testimony of the subscribing witnesses. They were the lawyer who drafted the will and his son, a law student. The direct testimony of each is almost completely conclusory and in neither do we find any factual or evidentiary statement bearing on the well-recognized tests of testamentary capacity. There was no discussion of decedent's assets or of her relatives and legatees and not the slightest indication of her motivation. The entire subject is covered in the record by one question to the lawyer and his nonresponsive answer: "Q. What did she say to you? A. I wrote it all in longhand on the table, the codicil to the Will." On redirect examination, he went so far as to make the incredible statement that decedent was as keen and as mentally alert as she had been 20 years before. The deficiencies in the testimony of the subscribing witnesses were not supplied to any substantial degree by the answers elicited on cross-examination or even pursuant to the leading questions asked on redirect; and the jury could well have found this evidence too tenuous for serious consideration.

We need not conjecture whether, under other circumstances, or, more specifically, in a situation involving mental disturbance of a different nature, the conclusion of the Surrogate's Court might be sustained. Here, we are not confronted merely with mental incapacity relieved by intermittent periods of lucidity, during which testamentary capacity might conceivably exist, but with the added factor of an abiding, insane delusion directed at the person who would normally be the principal or only object of testatrix' concern and bounty. This delusion was not an occasional thing but a persistent one for, as Father Korkemaz testified, her "fear was continual", being manifested "everytime she took medicine". Asked whether decedent indicated what she was afraid of, Father Korkemaz replied, "Only thing that I told you before, that the new Council ordered the children to kill their parents when they grow to be old and get sick. I told her, 'no, don't put this in your mind. The Commandment of God say, Thou shalt not kill. They would not go against that.'" Queried further as to her fear, he said, "She mentioned it many times; I am afraid to take the medicine, and, maybe it would kill me. I said, you take it from anyone that gives it to you but she never would take it from anyone else only Josephine Samia [her niece] and her sister."

The case of *Matter of Honigman* (8 N Y 2d 244) points to reversal here. There, upon a record similar to that before us, it was said: "We read this record as containing more than enough competent proof to warrant submitting to the jury the

issue of decedent's testamentary capacity. By the same token the proof amply supports the jury findings, implicit in the verdict, that the testator, at the time he made his will, was suffering from an unwarranted and insane delusion that his wife was unfaithful to him, which condition affected the disposition made in the will" (p. 248). The court's conclusion was not altered by reason of the fact that " all of the witnesses agreed that the deceased was normal and rational in other respects" (p. 249). " It is true ", the court continued, " that the burden of proving testamentary incapacity is a difficult one to carry (*Dobie* v. *Armstrong,* 160 N. Y. 584), but when an objectant has gone forward, as Mrs. Honigman surely has, with evidence reflecting the operation of the testator's mind, it is the proponents' duty to provide a basis for the alleged delusion. We cannot conclude that as a matter of law they have performed this duty successfully." (p. 250). It was held, further, that " the courts should have no hesitation in placing the issue of sanity in the jury's hands. To hold to the contrary would be to take from the jury its traditional function of passing on the facts " (p. 251); and the court concluded with a reference to its decision in *American Seamen's Friend Soc.* v. *Hopper* (33 N. Y. 619, 625) where the court " held that a will was bad when its ' dispository provisions were or *might have been* caused or affected by the delusion' (emphasis supplied)." (p. 251).

The decree, insofar as appealed from, should be reversed, on the law and the facts, the verdict reinstated and the case remitted to the Surrogate's Court for entry of a decree in accordance with this opinion.

HERLIHY, REYNOLDS, AULISI and STALEY, JR., JJ., concur.

Decree, insofar as appealed from, reversed, on the law and the facts, verdict reinstated and case remitted to the Surrogate's Court for entry of a decree in accordance with the opinion herein.