In the Matter of the Estate of FRANK KAPLAN, Deceased. GERALD L. MINKOFF et al., Appellants; ROSE KAPLAN et al., Respondents.

Third Department, January 15, 1976

*Carey, LaRocque & Piasecki (Dominick J. Viscardi* of counsel), for Gerald L. Minkoff, appellant.

*Solomon Block* for Rosalyn Minkoff, appellant.

*King, Murphy & Fitzsimmons (James A. Murphy* of counsel), for Rose Kaplan and others, respondents.

*Plumadore & Plumadore* for Max Minkoff, respondent.

*Abelove, Siegel, Abelove & Hester (C. Louis Abelove* of counsel), for Harriet Kaplan, respondent.

*Grant S. Young (Joseph J. Schinder* of counsel), for George Kaplan and others, respondents.

KANE, J. Frank Kaplan died on February 23, 1974, survived by 4 nephews, 10 nieces and 1 grandniece. In a purported will, dated July 17, 1972, he left his entire estate in equal shares to a nephew and niece, the appellants herein, naming the nephew as his executor. When this instrument was offered for probate, objections were duly filed by other distributees and a jury trial was directed by the Surrogate on framed issues which resulted in a verdict finding that decedent lacked testamentary capacity when he executed this purported last will and testament.

Decedent was employed and resided at the Will Rogers Hospital in Saranac Lake, New York, from September of 1939 until his retirement in June of 1961. He thereafter continued to reside on the grounds and remained on the payroll until July 30, 1972 doing certain odd jobs on a voluntary basis. During his association with the hospital he made a number of substantial monetary contributions to it and, on more than one occasion, the hospital absorbed a portion of the medical expenses he incurred as a patient. The records of the hospital indicate that after admission on July 23, 1971 as a result of a fall, a physical examination of decedent resulted in a diagnosis of "cerebral vascular arteriosclerosis with a blood deficiency that applies to the back part of the brain." It was noted that he was feeble; had to be helped around; had difficulty in reading; and at times lost his way around the hospital. His age was then given as 89. He was discharged as a patient on September 1, 1971, but on February 22, 1972, after suffering from dizziness for four days, was readmitted under the care and treatment of Dr. Blide. At trial this physician testified that decedent had a poor memory for recent events, an unsteady walk, and suffered from paranoid ideation for which he was administered Thoracin in an effort to stabilize his condition. Decedent was discharged to return to his own apartment on the hospital grounds on July 31, 1972 against medical advice.

Nurses' notes during this admission indicate decedent was often confused and paranoid; slept with his door barricaded; wanted to attack another patient with a knife; and became lost in the hospital. It was Dr. Blide's opinion that decedent was suffering from hallucinations and delusions as a result of senility; had lost his ability for abstract reasoning; and that his condition was progressive without any cure. A psychiatrist examined decedent at the hospital on April 26, 1972 and was

called as a witness at the trial by objectants. His testimony supported and reinforced that of Dr. Blide. According to him, decedent's condition was such that although there might be short periods of remission when decedent's condition would appear better, his mental capacity would remain the same, permanently impaired, and that during those brief periods his ability to reason would not be improved. In his opinion the decedent, on July 17, 1972, "was mentally ill to the same extent that he was on April 26, 1972, or worse." There was no medical evidence presented to contradict this testimony.

The proponents offered the testimony of the will draftsman, the subscribing witnesses (the draftsman, his partner and secretary), and the administrator of Will Rogers Hospital. The attorney who drew the will was acquainted with decedent but had never done any legal work for him until he appeared at his office with the nephew and niece who were to become the sole beneficiaries of his estate. While their contacts were brief, it appears from the record that detailed inquiry was conducted with respect to other relatives and decedent's relationship with the appellants. Other conversations about people in the Saranac Lake area followed and the subscribing witnesses all agreed that there was nothing in decedent's conduct, appearance or conversation which would indicate to them that he was not competent to make a will. It is proponents' contention that they satisfied their burden of proof and that there is no evidence that decedent lacked testamentary capacity on the day he executed his will. Accordingly, they further argue that their motion for a directed verdict at the close of the evidence should have been granted rather than allow the case to go to the jury.

The proponents must establish that decedent possessed the required testamentary capacity to execute a valid will. In this case, when they went forward with their proof, they established a prima facie case of testamentary capacity. However, when those contesting the will produce evidence to the contrary, in the absence of further evidence supporting proponents' contentions, a question of fact is presented which should ordinarily be submitted to the jury *(Matter of Beneway,* 272 App Div 463; *Matter of McClear,* 214 App Div 683). Each case must, of course, depend upon its own facts, but here it seems abundantly clear from a reading of this record in its entirety that sufficient conflicting evidence was developed to warrant submitting the issue of decedent's testamentary ca-

pacity to execute a valid will to the jury. In such circumstances, the court should not make that determination as a matter of law (*Matter of Honigman,* 8 NY2d 244; *Matter of Etoll,* 30 AD2d 224).

Other issues raised by appellants concerning the admissibility of certain evidence and the conduct of the trial are, in our opinion, without merit (*Matter of Patterson,* 206 Misc 268; Richardson, Evidence [10th ed], § 191, p 166).

The decree should be affirmed, with costs to all parties filing briefs, payable out of the estate.

HERLIHY, P. J. (dissenting). There can be no doubt that the objectants established that on April 26, 1972 the decedent suffered from senile dementia and their expert gave the further opinion that he so suffered on the day he made the will as a matter of pure opinion. Of course, there was no medical evidence to the contrary because the decedent was not given a medical examination on July 17, 1972 and it was established that the impairment was permanent. The psychiatrist, however, also testified that senile people have lucid intervals; that such a person's content of thought may improve on remission; that a lucid interval changes a person's judgment; and that to determine a patient's condition at such a time, a doctor would have to see the patient in a lucid interval. The courts have long recognized that proof of senile dementia does not establish a lack of testamentary capacity at a given time (*Matter of Beneway,* 272 App Div 463, 467–468). The medical evidence herein established senile dementia but, the question remains as to whether the decedent had a lucid interval at the time the will was made.

In this regard the majority recites that the proponents, through the subscribing witnesses and the attorney who interviewed the decedent on the day in question, drafted the will and supervised the execution thereof, "established a prima facie case of testamentary capacity." What the majority does not recognize is that the prima facie case establishes a lucid interval in terms of senile dementia and the record is devoid of *any* proof that the decedent did not enjoy such a lucid interval at the time the will was prepared and executed. The medical opinion of the psychiatrist is immaterial and irrelevant as it is not based upon the *fact* of a lucid interval on July 17, 1972. In this connection it is noteworthy that the nurse's notes as reviewed by Dr. Blide in his testimony for July 16, 1972 to July 18, 1972 indicated these were "good" days.

The record establishes that the decedent had only nieces and nephews as potential intestate heirs of his estate. The attorney who prepared the will on July 17, 1972 did so in the presence of the decedent and testified that decedent discussed with him the general outline of his assets at that time. The will selects a particular niece and nephew who had accompanied decedent to the attorney's office to receive the estate and recites a sound reason for their selection in paragraph three thereof.

It should be noted that whatever evidence there is in this record as to delusions or paranoia, the record established that the problem was being controlled by medicine on July 17, 1972 and the record will not support an inference that would connect the particular disposition in the will with such delusions or paranoia as they existed prior to July 17, 1972. (Cf. *Matter of Honigman,* 8 NY2d 244; *Matter of Etoll,* 30 AD2d 224.)

The sole evidence in this record is that the decedent had a lucid interval at the time he made the last will and testament and had testamentary capacity. The Surrogate should have so held and the submission of the question to the jury was erroneous as there was no factual issue. The apparent last wishes of a person should not be set aside upon mere speculation that he was *then* incompetent *(Matter of McClear,* 214 App Div 683). In any event, the jury finding would be against the weight of the evidence *(Matter of Beneway,* 272 App Div 463, *supra).*

The decree should be reversed and the matter remitted to the Surrogate with instructions to admit the will of July 17, 1972 to probate.

KOREMAN, MAIN and REYNOLDS, JJ., concur with KANE, J.; HERLIHY, P. J., dissents and votes to reverse in a separate opinion.

Decree affirmed, with costs to all parties filing briefs, payable out of the estate.