■ In the Matter of the Estate of ODELL WILLIAMS, Deceased. DARIA M. WILLIAMS, Appellant; GREGORY WILLIAMS et al., Respondents. [787 NYS2d 444]—

Spain, J. Appeal from an order of the Surrogate's Court of Otsego County (Burns, S.), entered November 17, 2003, which denied petitioner's motion to set aside the verdict.

In this proceeding, respondents—the issue of decedent—challenge his last will, executed on December 21, 2001 when he was 88 years old. Decedent died on May 24, 2002. In his will, decedent left $100 to each of his 10 surviving children and the remainder of his estate to petitioner, his wife.* After petitioner offered the will for probate, respondents filed objections, claiming that decedent lacked testamentary capacity or that the will was the product of fraud and undue influence. A jury trial ensued, during which petitioner twice moved, unsuccessfully, for a directed verdict. The jury thereafter returned a verdict finding that decedent lacked capacity to execute the will and did not reach the questions of fraud and undue influence. Petitioner's motion to set aside the verdict as against the weight of the evidence was denied. Petitioner appeals, and we now reverse.

"It is the indisputable rule in a will contest that '[t]he proponent has the burden of proving that the testator possessed testamentary capacity and the court must look to the following factors: (1) whether [he or] she understood the nature and consequences of executing a will; (2) whether [he or] she knew the nature and extent of the property [he or] she was disposing of; and (3) whether [he or] she knew those who would be considered the natural objects of [his or] her bounty and [his or] her relations with them' " (*Matter of Kumstar*, 66 NY2d 691, 692 [1985], quoting *Matter of Slade*, 106 AD2d 914, 915 [1984]). "When there is conflicting evidence or the possibility of drawing conflicting inferences from undisputed evidence, the issue of capacity is one for the jury" (*Matter of Kumstar, supra* at 692

---

* Decedent named his wife's son as the beneficiary of his residuary estate in the event his wife did not survive him.

[citation omitted]). Here, in our view, there was insufficient evidence adduced at trial to warrant submitting the issue of testamentary capacity to the jury.

We are satisfied that, through the self-executing affidavits and testimony of the individuals who witnessed the will's execution, including the testimony of decedent's attorney who drafted the will, petitioner met her initial burden of demonstrating decedent's capacity (*see Matter of Johnson*, 6 AD3d 859, 860 [2004]; *Matter of Long*, 176 AD2d 1059, 1059 [1991]). The attorney had known and represented decedent for several years and testified that decedent discussed his wishes concerning the will—including his intentions with respect to his children—directly with him. Indeed, after he sent an initial draft of the will to decedent, decedent expressed his dissatisfaction with it because it left nothing to his children, while it was his intention to leave them each one dollar. The attorney expressed his opinion to decedent that such a bequest was insulting and decedent ultimately agreed to leave the children $100 each. The attorney's legal secretary also witnessed the will's execution and her testimony confirmed his description of decedent as of sound mind on the day the will was executed.

Petitioner also introduced the testimony of the minister who married decedent and petitioner at the end of July 2001, shortly after decedent's release from a nursing home. He testified that he knew decedent, considered him a friend and that he was satisfied that decedent had the capacity at that point to enter the marriage. Two other witnesses—a neighbor who did business with respondent and a long-term friend—described decedent as coherent, strong-willed and of apparent sound mind in the months after he executed his will and prior to his death in May 2002. On this record, we find ample evidence that decedent was competent to execute a will on December 21, 2001 (*see Matter of Clapper*, 279 AD2d 730, 731-732 [2001]; *Matter of Van Patten*, 215 AD2d 947, 948 [1995], *lv denied* 87 NY2d 802 [1995]).

In support of a contrary determination, respondents rely on the fact that decedent resided in a nursing home from February 16, 2001 to July 22, 2001 and was only released from the nursing home upon petitioner's promise to render 24-hour care for him. The physician who examined decedent while he resided at the nursing home and reviewed decedent's medical records testified that decedent previously had been diagnosed with permanent dementia; he defined dementia as the incapacity of a patient to make decisions about daily life and, specifically with respect to decedent, indicated that decedent did not always know

the date. Significantly, the physician never rendered an opinion as to decedent's testamentary capacity at the time of the execution of the will, or at any time. Respondents also rely on medical records and nurse's notes from the nursing home which state that, during his residency there, decedent had "memory difficulty," "showed some impairment in his mentation," would "strain to give date and place," misnamed the President of the United States, at times made nonsensical statements and, in his discharge summary, it was noted that "a large issue with this patient was his dementia *which waxes and wanes considerably*" (emphasis added).

"Mere proof that the decedent suffered from old age, physical infirmity and chronic, progressive senile dementia when the will was executed is not necessarily inconsistent with testamentary capacity and does not alone preclude a finding thereof, as the appropriate inquiry is whether the decedent was lucid and rational at the time the will was made" (*Matter of Buchanan*, 245 AD2d 642, 644 [1997], *lv dismissed* 91 NY2d 957 [1998] [citations omitted]; *see Matter of Beneway's Will*, 272 App Div 463, 467-468 [1947]). Here, the only evidence introduced that decedent lacked capacity in late December of that year when he executed the will is the fact that the will, in listing decedent's children, contains the name "Mitchell" instead of his daughter "Michelle." Testimony from decedent's attorney establishes that this misnomer came about when he asked for a list of the children and decedent's wife listed them on a piece of paper, misnaming Michelle as Mitchell. Although the attorney admitted that he knew there was a Michelle, he did not catch the error when the list was copied into the will and decedent made no note of the error when he reviewed the will. However, the error appears in a paragraph listing the children's first names, no reference is made to a "son" named Mitchell and, thus, contrary to respondents' argument, it cannot be assumed that decedent thought he had eight sons and two daughters, instead of seven sons and three daughters. Indeed, given the similarity in the names and the fact that the error was not made directly by decedent, we do not find this drafting error to have any probative value. Accordingly, in light of the dearth of evidence that decedent lacked testamentary capacity at the time he executed the will, the verdict cannot stand (*see Matter of Kumstar*, 66 NY2d 691, 692 [1985], *supra*; *Matter of Johnson*, 6 AD3d 859, 860-861 [2004], *supra*; *Matter of Clapper, supra* at 730-731; *Matter of Van Patten, supra* at 948; *cf. Matter of Kaplan*, 50 AD2d 429, 431-432 [1976], *affd* 41 NY2d 870 [1977]).

Further, although the jury did not reach the issues, upon our

review of the evidence and in the interest of judicial economy, we find that respondents have not met their burden of establishing undue influence or fraud (*see Matter of McCloskey*, 307 AD2d 737, 739 [2003], *lv denied* 100 NY2d 516 [2003]). The proffered evidence that petitioner married decedent only five months before the will execution and just weeks after he was released from the nursing home and that she was present when the will was discussed and executed is insufficient to create any genuine issue of fact on these issues (*see Matter of Clapper, supra* at 732; *Matter of Long*, 176 AD2d 1059, 1060 [1991], *supra*; *cf. Matter of Johnson, supra* at 861). Indeed, the record establishes that decedent and his wife had lived together for some 20 years and, by all accounts, enjoyed an affectionate relationship.

Cardona, P.J., Mercure, Peters and Carpinello, JJ., concur. Ordered that the order is reversed, without costs, and motion granted.