| Matter of Augustine |
|:---:|
| 2007 NY Slip Op 34620(U) |
| November 14, 2007 |
| Surrogate's Court, New York County |
| Docket Number: File No. 1560/03 |
| Judge: Renee R. Roth |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------x
Probate Proceeding, Will of                          File No. 1560/03

    ROSE L. AUGUSTINE,

                Deceased.

------------------------------------------------x

R O T H, S.

    Incident to this contested probate proceeding in the Estate of Rose Augustine, the preliminary executors move for summary judgment dismissing the objections filed by the Drisha Institute for Jewish Education, the principal beneficiary under decedent's penultimate will (SCPA 1410).

    Rose Augustine was 93 years old when she died on April 21, 2003, leaving an estate of approximately 30 million dollars. She was survived by a brother and three children of predeceased siblings. During her lifetime, decedent had been the owner and chief executive of Albert Augustine Ltd., a guitar string manufacturing company which she had operated since her husband's death in 1967.

    The penultimate and propounded instruments were executed within two months of decedent's death.

    Under the propounded will, dated April 3, 2003, decedent, after making small gifts to certain relatives and establishing a

trust of $500,000 for the benefit of Patricia Carter (her long-time secretary), disposed of the residuary to The Augustine Foundation, which she had established during her lifetime. Preliminary letters testamentary issued on May 2, 2003, to Carter and Steven Griesgraber, a young employee of "Guitar Review," a classical guitar magazine which decedent had published and subsidized.

As noted above, Drisha, adversely affected by the propounded will, filed objections (SCPA 1410).

The background which led to this contested probate proceeding is as follows. In late 2002, Mrs. Augustine decided to increase the gift to Drisha she had made in her 1991 will, which left two-thirds of her residuary estate to the Foundation and one-third to Drisha, and named her attorney and friend Harry Silber along with his son David (the founder and dean of Drisha), as executors. Since Harry had died, she asked David to recommend a lawyer. He referred her to an experienced trusts and estates lawyer, Jonathan Herlands, who drafted the penultimate will and inter vivos trust agreement as well as a health care proxy and power of attorney. These instruments provided small cash bequests to decedent's nephew and nieces, a $100,000 cash bequest to Carter, and four-fifths of the residuary to Drisha and one-fifth to the Foundation. Silber was named as fiduciary and his wife, Devora Steinmetz, as successor fiduciary.

2

[* 2]

However, shortly after she executed these documents, decedent apparently had second thoughts. Among other things, she said that she preferred to give Carter an income interest in a trust rather than an outright bequest; that she did not like Devora Steinmetz and did not want her to be a fiduciary; and that the documents failed to dispose of her personal property or direct the continuation of "Guitar Review."

Over the next few weeks, decedent appeared to be preoccupied with the documents and she allegedly blamed Silber because he had recommended the draftsman. According to the testimony of her long-time accountant, Allan Rubin, her anger at Silber developed into hatred. She consulted another lawyer, Inna Fershtyn, on March 10th to discuss revising the documents. She told Fershtyn that although she wanted to eliminate Silber, she still intended to leave part of her estate to Drisha. Mrs. Augustine, however, was apparently offended by Fershtyn's suggestion that she should have a medical examination before proceeding any further and never retained her.

Mrs. Augustine's behavior and physical condition appear to have deteriorated significantly during the month of March. She fell a number of times, her speech became slurred and her behavior was somewhat erratic. Decedent allegedly became angry and distrustful when Rubin asked her to sign an apparently innocuous document. In the latter part of March, Rubin, on his

3

own, decided to stop trading on her account.

On Friday, March 28, 2003, Mrs. Augustine called Silber to her office to talk about the penultimate documents. Carter and Griesgraber were present. A tape recording of the meeting was made at decedent's direction. It shows that her speech was slurred and that she was confused and agitated. She accused Herlands and Silber of being "crook[s]" and of "chopping out" and "slipp[ing] in" provisions of her will against her wishes. She said that Herlands had called her "crazy" (an apparent reference to the suggestion by Fershtyn, rather than Herlands, that she have a medical exam) and accused Silber of trying to control everything and put her into an insane asylum. Near the end of the meeting, she said that she had not slept in three weeks, did not trust anyone, wanted to kill everybody, and was "mixed up" and did not "know what I want." Decedent, however, agreed that she would take the weekend to consider whether new documents would be drafted by Herlands, Fershtyn, or a new lawyer. After Silber left, despite her accusations against him, decedent told Griesgraber and Carter that she thought he "had nothing to do with it."

On the following Monday (March 31, 2003) decedent said that she wanted a new lawyer. Griesgraber contacted Elizabeth Harris and arranged a meeting with decedent the next morning (April 1st) at the office of Albert Augustine Ltd. When decedent failed to

4

[* 4]

appear, Griesgraber and Carter went to her home, where she lived alone, and found her on the floor where she had lain after falling the night before. She refused medical attention and insisted on seeing the lawyer. Harris came to decedent's home and interviewed her in the presence of Griesgraber and Carter. Since decedent was very deaf and her speech was garbled, Griesgraber and Carter acted as interpreters. Harris testified that decedent said she wanted to exclude Drisha from her will because she had been "betrayed" by David Silber who had obtained too much power over her through the penultimate instruments. She described Silber as greedy and crooked, and said that she did not like his wife.

Decedent fell again that evening (April 1st, 2003) and remained on the floor for 15 hours until Griesgraber and Carter found her. Although she was screaming, presumably in pain, decedent nonetheless protested when she was taken by ambulance on April 2nd to St. Vincent's Hospital. The intake physician noted her slurred speech and facial droop.

At Griesgraber's urging, Harris completed drafting the will and brought it to the hospital on the evening of April 3rd, accompanied by her associate, Alexander Trias. They found Griesgraber and Carter in decedent's hospital room, along with another employee of the Augustine company, Natavan Aleskerova, and decedent's friend Leonidas Mavrovitis. With respect to

5

decedent's mental condition, although a social worker who saw her earlier on the day of the will execution reported that she was alert and oriented, the hospital records establish that she was "very confused and agitated" throughout the night immediately following the will execution, and tore out her i.v. tubes at 4:30 a.m.

It is undisputed that decedent signed the will in the presence of two attesting witnesses, Trias and Mavrovitis. The recollections of those present differ, however, as to decedent's review of the document she signed. Harris testified that while sitting on the edge of decedent's bed she had discussed each provision of the will which Carter then repeated because decedent was very hard of hearing. According to Harris, such repetition gave her a "comfort level" that decedent understood the contents of the document. Trias, however, said that Carter repeated some, but not all, of the provisions. Carter, on the other hand, denied any participation whatsoever in the process, and Griesgraber and Aleskerova supported her version. In addition, although Harris and Mavrovitis both said that decedent participated in calculating fiduciary commissions, others did not recall any such discussion. Aleskerova testified that the only comment from decedent was an admonition to Harris not to talk to her as if she were a child.

Decedent's hostility to Silber remained. Around the time

6

the will was executed, she instructed Griesgraber to write "go to hell" on a get well card Silber had sent and to mail it back to him. She also told Rubin that she wanted to shoot Silber.

According to the hospital records, decedent's mental state fluctuated in the ensuing days, with periods of lucidity and periods of agitation and confusion. The diagnosis included dementia, cerebral atherosclerosis, and cerebral vascular infarct. She was released from the hospital on April 14th, after arrangements were made for 24-hour home care. She was readmitted three days later and died on April 21, 2003.

Although summary judgment may be granted in probate proceedings (Matter of Cioffi, 117 AD2d 860), the movant "must make a prima facie showing ... tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v. Prospect Hosp., 68 NY2d 320, 324). If the movant establishes a prima facie case, the burden shifts to the objectants to produce evidence to establish the existence of material issues of fact sufficient to preclude summary judgment (Alvarez v. Prospect Hospital, supra; Matter of Pollock, 64 NY2d 1156, 1158).

We turn first to the question of decedent's testamentary capacity, namely, whether she understood the nature and extent of her property, the natural objects of her bounty and the provisions of the instrument (Matter of Kumstar, 66 NY2d 691, 692, rearg denied 67 NY2d 647). Although old age, weakness and

7

senile dementia are not necessarily inconsistent with testamentary capacity (<u>Matter of Hedges</u>, 100 AD2d 586, 588; <u>see also</u> <u>Children's Aid Soc v Loveridge</u>, 70 NY 387, 392-93), objectant has offered evidence from which it could be found that decedent's medical and mental condition at the time that the propounded instrument was prepared and executed may have prevented her from acting knowingly (<u>Matter of Hedges</u>, <u>supra</u>). For example, decedent's statements with respect to her confusion and inability to sleep, the facts that she met the attorney-draftsman for the first time just after having spent the night on the floor, that she signed the propounded will in the hospital where she had been taken after falling again and remaining on the floor all night, and the dramatic change in the dispositive provisions of the instrument, all raise questions about her capacity. Furthermore, decedent's hostility to Silber and her conviction that she was the victim of crookery and trickery indicate that she may have been laboring under an insane delusion rendering her incapacitated to execute the propounded instrument (<u>Matter of Honigman</u>, 8 NY2d 244, 250; <u>Matter of Etoll</u>, 30 AD2d 224, 228-29). Accordingly, summary judgment dismissing this objection is denied.

We next turn to the objection concerning due execution. Proponent has the burden of establishing that the propounded instrument was executed in accordance with the formalities

[* 8]

required by ETL 3-2.1 (see, e.g., Matter of Cioffi, supra; Matter of Watson, 37 AD2d 897, 898). The record reflects that the instrument bears the signatures of two attesting witnesses, contains an attestation clause and is supported by a contemporaneous self-proving affidavit (SCPA 1406), and was supervised by a lawyer. Where questions about a testator's competence to understand the import of such execution are raised, however, the mere observance of formalities is insufficient to dismiss objections on due execution grounds (see, e.g., Matter of Martinez, NYLJ 11/19/07 p 33 col 4. This is particularly true where, as here, decedent had limited communication with the attorney-draftsman, where her hearing was significantly impaired and where there is conflicting testimony as to whether she reviewed the will before she signed it. Accordingly, summary judgment dismissing the objection as to due execution is denied.

Proponent also moves to dismiss the objection alleging undue influence in the procurement of the propounded instrument by Patricia Carter and Steven Griesgraber. Objectants bear the burden of proving that the propounded instrument was procured by undue influence (Matter of Walther, 6 NY2d 49, 54; Matter of Schillenger, 258 NY 186). Influence is undue when it "subverts the intent or will of the testator, internalizes within the mind of the testator the desire to do that which is not his intent but the intent and end of another" (Matter of Burke, 82 AD2d 260,

9

270, quoting Matter of Kaufmann, 20 AD2d 464, 483, affd 15 NY2d 825). To prove undue influence, objectant must show that the person alleged to have exerted such influence not only had the motive and opportunity to influence the decedent, but also that he actually used such influence and by doing so destroyed the testator's own judgment and volition (Warren's Heaton, Surrogates' Courts §42.07[1] at 42-126 [6th ed rev]; Matter of Walther, supra; Children's Aid Soc v Loveridge, supra; Matter of Williams, 180 AD 203, aff'd 223 NY 582). Since direct evidence of undue influence is seldom available, the law permits appropriate inferences to be drawn from circumstantial evidence (Matter of Camac, 300 AD2d 11, 12).

Where a person alleged to have benefited from the exercise of undue influence in the making of a will is in a confidential relationship with the testator, the fact-finder may draw an inference of such influence, particularly where such person also had some involvement in the preparation or execution of the propounded instrument (Matter of Bartel, 214 AD2d 476, 477). To counter such inference, the party alleged to have exercised it must provide an alternate explanation for the testator's gifts (Matter of Neenan, 35 AD3d 475, 476, citing Matter of Putnam, 257 NY 140).

Objectants have raised sufficient questions as to whether Carter and Griesgraber were in a confidential relationship with

10

decedent and whether undue influence was exercised to mandate against dismissal of the objection. The record suggests that as decedent's health and mental status deteriorated, she may have become more dependent upon them and more vulnerable to undue pressure from them. After she became estranged from Silber and distrustful of Rubin, the persons on whom she depended appear to have been Carter and Griesgraber who picked her up off the floor after her falls and arranged for her medical care. In addition, Griesgraber and Carter were directly involved in the procurement and execution of the propounded will. Griesgraber arranged the meeting between the attorney-draftsman, Harris, and decedent, and both of them were present at Harris's initial meeting with decedent and when the will was executed. Furthermore, Harris relied on them to facilitate her communication with decedent. An additional factor to be considered is that the propounded instrument materially deviates from decedent's prior testamentary pattern (Matter of Brush, 1 AD2d 625, 628) and that Carter and Griesgraber are named as fiduciaries of this multi-million dollar estate, from which they could expect significant commissions. Based upon the foregoing, proponent's motion seeking dismissal of the objection that the propounded instrument was procured by undue influence is denied.

The final objection alleges that the will was procured by the fraud of Carter and Griesgraber or persons acting in privity

11

with them.   To prove fraud, it must be shown that the "proponent knowingly made a false statement that caused decedent to execute a will that disposed of his property in a manner different from the disposition he would have made in the absence of that statement" (Matter of Coniglio, 242 AD2d 901, 902).   Objectant did not offer any facts in support of this objection, which is accordingly dismissed.

This decision constitutes the order of the Court.


_____

S U R R O G A T E


November 14, 2007